UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and THE STATE OF TENNESSEE, *ex rel.*, LISA K. STRATIENKO, | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:10-CV-322 |
| v. | ) ) | Judge Curtis L. Collier |
| CHATTANOOGA-HAMILTON COUNTY HOSPITAL AUTHORITY d/b/a ERLANGER MEDICAL CENTER, | ) ) ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM

Before the Court is Defendant Chattanooga-Hamilton County Hospital Authority d/b/a

Erlanger Medical Center's ("Defendant" or "Erlanger") motion to dismiss Relator's amended

complaint (Court File No. 53). Plaintiff Lisa K. Stratienko ("Plaintiff" or "Relator"), on behalf of

the United States of America ("United States") and the State of Tennessee (collectively, "Plaintiffs")

filed a response to Erlanger's motion (Court File No. 56)[1] and Erlanger submitted a reply as well

as various filings containing supplemental authority (Court File Nos. 58, 59, 62). For the following

reasons, the Court will **GRANT IN PART** and **DENY IN PART** Erlanger's motion to dismiss

(Court File No. 53).

---

[1] The United States also filed a statement of interest regarding Erlanger's motion to dismiss
the amended complaint (Court File No. 57).

# I. RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

## A. Factual Background

Relator, a citizen and resident of Tennessee, brings claims on behalf of the United States and the State of Tennessee against Defendant alleging violations of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended (the "FCA") (Court File No. 49 ("Am. Compl.")). Relator also alleges violations of the Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 71-5-181 *et seq.*, and the Tennessee False Claims Act, Tenn. Code Ann. §§ 4-18-101 *et seq.* (collectively, the "TFCA"). Defendant Chattanooga-Hamilton County Hospital Authority ("CHCHA" or, for purposes of this memorandum "Erlanger") owns and operates Erlanger Health Systems ("EHS"), which includes Erlanger Medical Center ("EMC"), and provides inpatient, outpatient, and other medical services to patients in Hamilton County, Tennessee and North Georgia (*id.* ¶ 10). Erlanger also offers support in various ways to the University of Tennessee College of Medicine ("UTCOM"). In the amended complaint, Relator begins by discussing the relevant legal framework, which includes an overview of Medicare, Medicaid, and TennCare; the FCA; the "Stark Law," 42 U.S.C. § 1395nn, which prohibits healthcare entities from submitting certain claims for payment when the patient referral came from a physician who had a "financial relationship" with the entity; and the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), which prohibits the payment of kickbacks.

Relator's allegations can be grouped into four sets of issues: (1) the remuneration scheme between Erlanger, UTCOM, and the Internal Medicine Education Foundation, Inc. ("IMEF"); (2) the improper financial arrangements between Erlanger and certain physician groups and physicians; (3) allegations of improper credentialing and unlawful remuneration involving Erlanger, Dr. Van Stephen Monroe, and the Chattanooga Heart Institute ("CHI"); and (4) the false claims allegations.

2

Each set of allegations will be addressed below.

### 1.     Erlanger/UTCOM/IMEF Remuneration Scheme

Beginning with the first set of allegations, Relator alleges Erlanger engaged in an improper arrangement with UTCOM and IMEF in 2004, 2005, and 2006 for the purpose of increasing patient referrals from area physicians (Am. Compl. ¶ 51). UTCOM sponsored nine residency programs for its students, and IMEF had retained "Teaching Physicians" to provide teaching services in connection with UTCOM's residency programs at Erlanger (*id.* ¶¶ 52-53). During this time period, Erlanger made payments to UTCOM (*id.* ¶ 54). It was understood that UTCOM would transfer the funds to IMEF and IMEF would then disburse the funds to the Teaching Physicians (*id.* ¶ 54). No written agreement, however, was executed between Erlanger and UTCOM regarding those payments (*id.* ¶ 55). Moreover, contemporaneous written agreements were also not executed between UTCOM and IMEF regarding the payments that were ultimately disbursed to IMEF's Teaching Physicians (*id.* ¶ 56). Instead, each of the written agreements or "teaching contracts" between UTCOM and IMEF were signed retroactively, "after the effective date, after the services were performed by Teaching Physicians, and after claims for payment were submitted by Erlanger for services rendered by the Teaching Physicians" (*see* Am. Compl. ¶¶ 58-68). Meanwhile, in 2004, 2005, and 2006, the Teaching Physicians were referring patients to Erlanger whose services would be paid for in whole or in part by Medicare, Medicaid, and TennCare (*id.* ¶ 57). Thus, in sum, Relator alleges Erlanger (in the absence of contemporaneously executed written agreements between Erlanger and UTCOM or UTCOM and IMEF) "indirectly through UTCOM and IMEF, knowingly and willfully made payments to the Teaching Physicians to induce the Teaching Physicians to refer patients to Erlanger for the furnishing of medical services for which payment may be made in whole or in part under

3

Medicare, Medicaid, and TennCare" (*id.* ¶¶ 70-71).

**2.     Improper Financial Arrangements Between Erlanger and CHI, Dr. Mutter, Dr. Monroe, and Galen Medical Group, P.C.**

Relator's second set of allegations concern financial arrangements that Erlanger entered into with certain physician groups and physicians "in an effort to promote physician 'loyalty' and to increase referrals" (*id.* ¶ 72). In each instance, Erlanger made payments for services rendered for a period of time in the absence of an executed written contract, and the recipient made patient referrals to Erlanger during that same time period.

Relator highlights numerous examples between 2004 and 2008 involving agreements between Erlanger and various physician groups and physicians where the physician group or physician performed a service on behalf of Erlanger prior to the execution of any written contract and was compensated for its services (*id.* ¶¶ 73-132). The noted instances involved the following agreements:[2] (1) agreements between Erlanger and CHI to perform interpretative non-invasive cardiac procedures (i.e. CHI Interpretative Agreement 1, CHI Interpretative Agreement 2, CHI Interpretative Agreement 3); (2) agreements between Erlanger and CHI pertaining to kidney transplants (i.e. CHI Kidney Agreement, Extended CHI Kidney Agreement); (3) agreement between Erlanger and CHI to furnish a medical director for Erlanger (i.e. CHI Medical Director Agreement); (4) agreements between Erlanger and CHI pertaining to certain research studies (i.e. CHI Research Study Agreement, CHI/Monroe Research Study Agreement); (5) agreements between Erlanger, CHI, and Dr. Mitch Mutter regarding Mutter serving as Erlanger's Chief of Staff and, later, the Immediate Past Chief of Staff, as well as an agreement retroactively paying Mutter a larger salary for his

_____

[2] Relator has attached to her amended complaint copies of the various contracts and agreements entered into between Erlanger and the various physician groups and physicians.

4

services as Immediate Past Chief of Staff (i.e. CHI/Mutter COS Agreement, CHI/Mutter IPCOS Agreement, Revised IPCOS Agreement); and (6) agreement between Erlanger and Galen Medical Group, P.C. ("Galen") to perform interpretative non-invasive cardiac procedures (i.e. the Galen Agreement).

During the above time periods, CHI, Mutter, Monroe, and Galen made patient referrals to Erlanger. Specifically, Relator alleges "Erlanger knowingly and willfully made payments to Galen, as well as CHI and/or Mutter and Monroe, to induce these groups and physicians to refer patients to Erlanger for the furnishing of medical services for which payment may be made in whole or in part under Medicare, Medicaid, and TennCare" (*id.* ¶¶ 133-34).

As proof that Erlanger acted "knowingly and willfully," Relator alleges Erlanger made false certifications with respect to the Corporate Integrity Agreement (the "CIA") entered into between Erlanger and the Office of the Inspector General ("OIG") of the Department of Health and Human Services (Am. Compl. ¶¶ 135-44). In 2003, the OIG began investigating Erlanger and other entities, which resulted in Erlanger paying $40 million as part of the subsequent settlement agreement (*id.* ¶ 135). One part of the agreement required Erlanger to enter into a CIA with the OIG on October 24, 2005 (*id.* ¶ 136). Among other things, the CIA stated that, prior to entering into any new or revised "arrangements" (that is, any transaction or agreement involving "directly or indirectly, the offer, payment solicitation, or receipt of anything of value; and is between Erlanger and any actual or potential source of health care business or referrals to Erlanger or any actual or potential recipient of health care business or referrals from Erlanger"), the arrangement must be signed by all parties and put in writing (*id.* ¶¶ 137-38). Erlanger was also required to execute and submit a certification stating it had complied with the CIA requirements (*id.* ¶ 139). If Erlanger materially breached the

terms of the CIA, it could be prohibited from participating in the Medicare and Medicaid programs (*id.* ¶ 140). Relator alleges Erlanger submitted false and incorrect certifications to the OIG because it failed to report several of the above reportable events during the term of the CIA, which was October 24, 2005, through October 24, 2010 (*id.* ¶ 143).

Next, Relator alleges Erlanger entered into agreements with some of the aforementioned physician groups or physicians at amounts in excess of market value. For instance, between 2005 and 2011, with respect to CHI Interpretative Agreements 2, 3, and 4, Erlanger agreed to pay CHI $55,000, $63,000, and $91,500, respectively, when the market value for services rendered was at most $50,000 (Am. Compl. ¶¶ 145-56). Second, Erlanger entered into a contract between 2009 and 2011 with CHI called the "Call Coverage Contract" in which CHI was paid $1,750 per day to provide cardiology call coverage for Erlanger (*id.* ¶¶ 159-62). Relator alleges the funds paid were in excess of market value because the services had previously been performed for free by on-staff cardiologists; Relator alleges the market value of the services was, therefore, zero (*id.* ¶ 164). As another example, on January 25, 2010, Erlanger entered into an employment agreement with Mutter (*id.* ¶ 167). Relator alleges Mutter, a non-invasive cardiologist, was compensated with a signing bonus of $45,000 and a base salary of $450,000, when, according to market research, the salary range for a non-invasive cardiologist in the Chattanooga area is between $204,910 and $396,566; Relator also observes that Mutter was even paid more than his superior (*id.* ¶¶ 168-74). During the terms of each of the aforementioned agreements, Relator alleges the relevant physician groups or physician made patient referrals to Erlanger "for the furnishing of medical services for which payment may be made in whole or in part under Medicare, Medicaid, and TennCare" and that Erlanger "knowingly and willfully" made payments to the physician groups or physician to induce

6

them to make the referrals (*id.* ¶¶ 157-58, 165-66, 175-76).

### 3. Improper Credentialing

Relator alleges between 2005 and 2009 Erlanger made unlawful payments to Dr. Monroe and CHI "by knowingly allowing Monroe to perform medical procedures at Erlanger he was not properly credentialed, qualified, or trained to perform in exchange for patient referrals" (Am. Compl. ¶ 177). Relator alleges that despite the lack of training and qualifications Monroe was granted privileges to perform interventional peripheral vascular procedures at Erlanger beginning in 2003 (*id.* ¶¶ 187-90). Relator alleges between 2005 and 2008 Monroe and CHI received "substantial funds" associated with the procedures performed by Monroe; at the same time, Monroe and CHI were referring patients to Erlanger for services that would be paid through Medicare, Medicaid, and TennCare (*id.* ¶¶ 191-92). Relator further alleges during this time period Erlanger, Monroe, and CHI submitted false claims to the United States and the State of Tennessee for reimbursement because the procedures at issue were performed in violation of the Anti-Kickback Statute (*id.* ¶¶ 193-94).

### 4. False Claims

Finally, Relator alleges Erlanger submitted various false and fraudulent claims to and received reimbursements from the United States and the State of Tennessee between the years of 2005 and 2011 (*id.* ¶¶ 195-99). The false and fraudulent claims and reimbursements at issue pertain to services provided at Erlanger to patients referred by the Teaching Physicians, Monroe, Mutter, CHI, and Galen (*id.*). Other claims and reimbursements that Relator alleges are false and fraudulent were submitted or received between 2005 and 2008 and pertain specifically to the services provided by Dr. Monroe who was allegedly unqualified and lacked proper training at the time (*id.*).

### B. Procedural Background

On November 30, 2010, Relator filed a complaint on behalf of the United States and the State of Tennessee against Erlanger (Court File No. 1). On March 28, 2012, the United States filed a notice of election to decline intervention (Court File No. 27). The State of Tennessee followed suit and filed a notice of declination on March 30, 2012 (Court File No. 28). Erlanger filed a motion to dismiss Relator's complaint, which was subsequently denied as moot when Relator filed an amended complaint on October 23, 2012.

In Relator's amended complaint, Relator asserts three causes of action: (1) violations of the Corporate Integrity Agreement; (2) presentation of false claims in violation of 31 U.S.C. § 3729(a)(1)(A), Tenn. Code Ann. § 71-5-182, and Tenn. Code Ann. § 4-18-103; and (3) making or using a false record or statement to cause a claim to be paid in violation of 31 U.S.C. § 3729(a)(1)(B),[3] Tenn. Code Ann. § 71-5-182, and Tenn. Code Ann. § 4-18-103 (Am. Compl. ¶¶ 202-14). Relator seeks damages on her own behalf as well as on behalf of the United States and the State of Tennessee as allowed under the relevant statutes.

## II.    STANDARD OF REVIEW

Erlanger seeks dismissal pursuant to both Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure. Rule 12(b)(1) addresses whether the district court has subject matter jurisdiction over the plaintiff's claims. Fed. R. Civ. P. 12(b)(1). Under Rule 12(b)(1), a defendant may challenge the Court's subject matter jurisdiction through a facial attack or a factual attack. *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007) (citing *Ohio*

---

[3] The amended complaint actually says § 3729(a)(2) rather than § 3729(a)(1)(B), but Relator clarifies in her response brief that she intended the latter and Erlanger interpreted the amended complaint to read as such.

8

*Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990)). A facial attack "questions merely the sufficiency of the pleading." *Id.* A court must take the allegations in the complaint to be true when reviewing a facial attack. *Id.* On the other hand, where there is a factual attack, the Court must weigh conflicting evidence provided by the plaintiff and the defendant to determine whether subject matter jurisdiction exists. *Id.* Such evidence can include, and is not limited to, "affidavits, documents, and even a limited evidentiary hearing to resolve jurisdictional facts." *Id.* The party asserting that subject matter jurisdiction exists has the burden of proof. *Davis v. United States*, 499 F.3d 590, 594 (6th Cir. 2007).

A Rule 12(b)(6) motion, on the other hand, should be granted when it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Lewis v. ACB Bus. Servs., Inc.*, 135 F.3d 389, 405 (6th Cir. 1998). For purposes of this determination, the Court construes the complaint in the light most favorable to the plaintiff and assumes the veracity of all well-pleaded factual allegations in the complaint. *Thurman v. Pfizer, Inc.*, 484 F.3d 855, 859 (6th Cir. 2007). The same deference does not extend to bare assertions of legal conclusions, however, and the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

The Court next considers whether the factual allegations, if true, would support a claim entitling the plaintiff to relief. *Thurman*, 484 F.3d at 859. Although a complaint need only contain a "short and plain statement of the claim showing that the pleader is entitled to relief," *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting Fed. R. Civ. P. 8(a)(2)), this statement must nevertheless contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "[T]o survive a motion to dismiss, a complaint

must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility as explained by the Court "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show [n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

Finally, at issue in this case is the heightened pleading standard required for allegations of fraud under Fed. R. Civ. P. 9(b). A complaint that alleges violations of the FCA must plead fraud with particularity. *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 466 (6th Cir. 2011).

## III. DISCUSSION

Erlanger seeks dismissal of Relator's amended complaint on three grounds. First, Erlanger argues Relator's claims are subject to dismissal due to the FCA's public disclosure bar and because the Court lacks subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1).[4] Second, Erlanger contends Relator's claims must be dismissed because Relator fails to satisfy the heightened pleading standard of Rule 9(b) and fails to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Finally, Erlanger avers Relator's cause of action pertaining to violations of the Corporate Integrity Agreement must be dismissed because Relator

---

[4] In fact, Erlanger seeks dismissal of both the federal and state FCA claims on these grounds. Because of the similarities between the FCA and TFCA, the lack of Tennessee law directly addressing the issues in this case, and Relator's lack of objection to considering the claims together, the Court's analysis with respect to Relator's FCA claims will also apply to Relator's TFCA claims.

10

cannot state a claim for breach of the Corporate Integrity Agreement. Each issue will be addressed in turn.

### A.    Public Disclosure Bar (Counts II and III)

Erlanger first seeks dismissal on the basis that Relator's claims are subject to the public disclosure bar found in 31 U.S.C. § 3730 of the FCA and because the Court lacks subject matter jurisdiction to hear Relator's FCA claims pursuant to Fed. R. Civ. P. 12(b)(1). Erlanger argues allegations substantially similar to those in Relator's amended complaint have already been disclosed and covered extensively in two news media sources and have been disclosed in prior litigation. Erlanger further argues the disclosures collectively reveal the same type of fraudulent activity alleged by Relator. In particular, Erlanger contends the public disclosures at issue "plainly put the Government on notice of the likelihood of fraudulent activity because they represent repeated, explicit, and public allegations of fraud" (Court File No. 54 at 23). Erlanger also avers the allegations in the amended complaint are "based upon" the allegations previously disclosed to both the news media and revealed in other litigation. Finally, although Erlanger acknowledges that a relator's claim will not be dismissed under the public disclosure bar if the relator is an "original source of the information," Erlanger contends Relator does not qualify as an "original source." Accordingly, Erlanger insists Relator's FCA claims must be dismissed.

Relator, in response, argues the public disclosure bar is inapplicable. For purposes of addressing Erlanger's motion to dismiss, Relator concedes the alleged disclosures have been made "public." However, Relator disputes whether the disclosures reveal the same kind of fraudulent activity alleged in the amended complaint and whether the amended complaint is based upon the disclosures. In particular, Relator points out that none of the public disclosures at issue "refer[s] to

11

the submission of false claims to Medicare"; "refer[s] to the specific contracts and arrangements that are referenced in the Amended Complaint"; "deal[s] with FCA filings"; or, with the exception of one document, "refer[s] to the IMEF" (Court File No. 56 at 21). Relator further points out that all of the alleged arrangements and transactions at issue in the amended complaint occurred on or after July 1, 2004, whereas the primary conduct at issue in the public disclosures occurred prior to this date. Finally, Relator provides other reasons as to why the information contained in the disclosures is distinguishable from the allegations in the amended complaint. For these reasons, Relator contends the FCA claims should not be dismissed under the public disclosure bar.

1. **Applicable Law**

The False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.*, "is an anti-fraud statute that prohibits the knowing submission of false or fraudulent claims to the federal government." *United States ex rel. Bledsoe v. Community Health Sys., Inc.*, 501 F.3d 493, 502-03 (2007). The statute imposes liability upon anyone who, *inter alia*, "knowingly presents or causes to be presented, a false or fraudulent claim for payment or approval" or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. §§ 3729(a)(1)(A) & (B).

Prior to being amended in 2010, the FCA included a public disclosure provision that limited "the subject matter jurisdiction of federal courts over *qui tam* actions based upon previously disclosed information." *United States ex rel. Poteet v. Medtronic, Inc.*, 552 F.3d 503, 511 (6th Cir. 2009). The provision, 31 U.S.C. § 3730(e)(4)(A), stated:

> No court shall have jurisdiction over an action under this section *based upon the public disclosure of allegations or transactions* in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought

by the Attorney General or the person bringing the action is an original source of the information.

*id.* (emphasis added); *Poteet*, 552 F.3d at 511.

The provision was subsequently amended March 23, 2010, in the Patient Protection and Affordable Care Act ("PPACA"), *see* Pub. L. No. 111-148, 124 Stat. 119 (2010), and now reads as follows:

> (A) The court shall dismiss an action or claim under this section, unless opposed by the Government, if *substantially the same allegations or transactions* as alleged in the action or claim were publicly disclosed—
> (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
> (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or
> (iii) from the news media,
>
> unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A) (emphasis added).[5] With that said, the amended language would only apply to conduct that occurred after March 23, 2010. *See Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 283 n.1 (2010) (observing the amended legislation "makes no mention of retroactivity"). Moreover, the primary difference between the pre-PPACA and post-PPACA language is that the pre-PPACA language emphasizes that the allegations must be "based upon the public disclosure" whereas the post-PPACA language emphasizes that the disclosure must involve "substantially the same allegations or transactions." Even prior to the PPACA, however, the United States Court of Appeals for the Sixth Circuit expressed that "[i]n making this determination of whether an action is 'based upon' a public disclosure, a court should look to whether substantial

---

[5] The definition of "original source" also changed in part when the statute was amended.

13

identity exists between the publicly disclosed allegations or transactions and the *qui tam* complaint." *United States ex rel. Jones v. Horizon Healthcare Corp.*, 160 F.3d 326, 332 (6th Cir. 1998). Thus, as noted by Erlanger, the general case law pertaining to the public disclosure bar would still be applicable to this Court regardless of if it was decided before or after the PPACA. *See United States ex rel. Osheroff v. HealthSpring, Inc.*, No. 3:10-1015, 2013 WL 1399344, at *7 n.10 (M.D. Tenn. Apr. 5, 2013).[6]

To determine whether the public disclosure bar applies, a court must consider "first whether there has been any public disclosure of fraud, and second whether the allegations in the instant case are 'based upon' the previously disclosed fraud." *Poteet*, 552 F.3d at 511 (quoting *United States ex rel. Gilligan v. Medtronic, Inc.*, 403 F.3d 386, 389 (6th Cir. 2005)). "If the answer is 'no' to [either] of these questions, the inquiry ends, and the *qui tam* action may proceed; however, if the answer to each of the above questions is 'yes,' then we must determine whether the relator nonetheless qualifies as an 'original source' under § 3730(e)(4)(B), in which case the suit may proceed. *Id.* (quoting *Walburn v. Lockheed Martin Corp.*, 431 F.3d 966, 974 (6th Cir. 2005)).

### 2. Public Disclosure of Fraud

"For a relator's *qui tam* action to be barred by a prior 'public disclosure' of the underlying fraud, the disclosure must have (1) been public, and (2) revealed the same kind of fraudulent activity against the government as alleged by the relator." *Poteet*, 552 F.3d at 511 (citing 31 U.S.C. § 3730(e)(4)(A) and *United States ex rel. Burns v. A.D. Roe Co.*, 186 F.3d 717, 723 (6th Cir. 1999)). Relator does not dispute that the disclosures at issue--that is, the news articles, specifically the

---

[6] Another distinction, noted by Defendant, between the pre- and post-PPACA language is that the pre-PPACA language made the public disclosure bar jurisdictional in nature whereas the post-PPACA language still provides a basis for dismissal but that basis is no longer jurisdictional.

*Chattanooga Times Free Press* newspaper articles and *The Chattanoogan* online news articles, as well as the documents pertaining to prior litigation--are "public" for purposes of this motion. Hence, the remaining issue is whether those disclosures "revealed the same kind of fraudulent activity" against the United States and the State of Tennessee as alleged by Relator.

"[A] public disclosure reveals fraud if 'the information is sufficient to put the government on notice of the likelihood of related fraudulent activity.'" *United States ex rel. Poteet v. Medtronic, Inc.*, 552 F.3d 503, 512 (6th Cir. 2009) (quoting *United States ex rel. Gilligan v. Medtronic, Inc.*, 403 F.3d 386, 386 (6th Cir. 2005)); *see Walburn v. Lockheed Martin Corp.*, 431 F.3d 966, 975 (6th Cir. 2005) ("[T]he 'allegations and transactions' forming the basis of a *qui tam* have been disclosed 'when enough information exists in the public domain to expose the fraudulent transaction or the allegation of fraud.'" (citation omitted)). The disclosure at issue "is not required to use the word 'fraud' or provide a specific allegation of fraud." *Id.*; *see United States v. A.D. Roe Co.*, 186 F.3d 717, 724 (6th Cir. 1999) (noting that in a prior case the Sixth Circuit had indicated "publicly disclosed documents need not use the word 'fraud,' but need merely to disclose information which creates 'an inference of impropriety'"). Also, "the information suggesting fraud need not even come from the same source as long as the different sources 'together provide information that leads to a conclusion of fraud.'" *Id.* (citing *Gilligan*, 403 F.3d at 390).

Generally, there are two types of disclosures considered sufficient for providing notice to the government of fraud. *Poteet*, 552 F.3d at 512. The first type involves instances where "the information about both a false state of facts and the true state of facts has been disclosed"; this type of disclosure is considered adequate "because fraud is implied." *Id.* (citing *Gilligan*, 403 F.3d at 389). The second type of public disclosure involves instances where "there has been a direct

15

allegation of fraud"; "such an allegation, regardless of its specificity, is sufficient to put the government on notice of the potential existence of fraud." *Id.* at 513 (citing *Gilligan*, 403 F.3d at 389).

Before turning to the question of whether the disclosures here were sufficient to put the government on notice of fraud, the Court will summarize the various disclosures offered as exhibits by Erlanger and other relevant information in the record. As a preliminary matter, as Relator even acknowledges in her amended complaint, the United States launched an investigation in 2003 pertaining to allegations of fraudulent conduct in violation of the FCA that resulted in Erlanger entering into a $40 million settlement agreement with the OIG in 2005. The disclosures offered as exhibits by Erlanger would have occurred around or after this time period.

Some of the disclosures pertain to allegations made by Relator's husband, Dr. Alexander Stratienko, regarding allegedly unfair arrangements between Erlanger, CHI, and Dr. Mutter. For instance, Exhibit A is an April 24, 2003 newspaper article from *The Chattanoogan* entitled "Erlanger Cardiologist Hits Deal for Chattanooga Heart Institute" (Court File No. 55-1). The article describes how Dr. Stratienko, a cardiologist with Erlanger Medical Center at the time, told Erlanger at a meeting he believed an agreement reached between Erlanger and CHI was unfair to other hospital cardiology groups. In particular, he highlighted the fact that one part of the agreement involved making Mutter the cardiology director with an annual salary of $50,000; Dr. Stratienko claims he personally had been willing to do the job for free. Dr. Stratienko also noted the agreement involved making payments to UTCOM that would flow to CHI for teaching stipends valued at an amount more than he received for teaching; those payments would also be used to subsidize costs of rental facilities for the Teaching Physicians. Exhibit B, an article entitled "Erlanger Defers Action

16

on Cardiology Appointment for Dr. Mitch Mutter," from *The Chattanoogan* dated March 19, 2003, preceded the above article and provides additional background information about the agreement between Erlanger and CHI (Court File No. 55-2).

These issues are also extensively discussed in subsequent newspaper articles. Exhibit C is an article dated April 25, 2003, from *The Chattanoogan* entitled "Erlanger Physician Questions Role of UT College of Medicine" (Court File No. 55-3). Dr. Stratienko was again in the news expressing his concerns about Erlanger's relationship with UTCOM and CHI. In fact, he is quoted as saying the proposed deal between Erlanger and CHI, which also involved a rent arrangement with UTCOM, "raises a concern that the UT College of Medicine would be used for what amounts to money laundering" (*id.* at 2). The article further notes that the Department of Justice had recently begun investigating compliance and contract issues involving Erlanger. Finally, Exhibit E, a news article from the *Chattanooga Times Free Press* dated May 24, 2003, entitled "Surgeon says UT Leases at Erlanger Need Review" (Court File No. 55-5) addresses similar issues and includes a statement from Dr. Stratienko that the rent arrangements "deserve review by federal and state investigators" (*id.* at 2).

The next set of disclosures are various court-related documents that mention improper relations between Erlanger and CHI, Monroe's lack of credentialing, concerns about call coverage, and other matters. Exhibit G is a copy of the amended complaint filed in *Stratienko v. Chattanooga-Hamilton County Hosp. Auth.*, 04-C-1497, in Hamilton County Circuit Court (Court File No. 55-7). Dr. Stratienko asserted both state and federal due process claims against Erlanger (or "CHCHA") as well as various state law claims for suspending his medical staff privileges. The stated reason for the suspension pertained to a physical altercation between Stratienko and Monroe. Stratienko,

17

however, alleged Erlanger took adverse action against him because he had complained to various Erlanger representatives about actual and proposed arrangements Erlanger had with certain cardiology groups, including CHI. For instance, Stratienko pointed out that "CHI and Erlanger had executed a Letter of Intent about which [Stratienko] complained to the Board of Trustees of Erlanger as being a subsidy in excess of $1,000,000.00 which favored one group of cardiologists, *i.e.*, CHI, over the other cardiologists practicing at the hospital (and being likely illegal) because of such unequal treatment" (*id.* at 4). In the second amended complaint, Exhibit H, which further articulates the basis for Relator's claims against Erlanger and other defendants, Stratienko states the suspension was "in retaliation for Plaintiff's statements to the Board of Trustees relating to the propriety of the actions of Dr. Mutter relative to a certain letter of intent by and between the Cardiovascular Group, P.C. d/b/a The Chattanooga Heart Institute ("CHI"), and the Chattanooga-Hamilton County Hospital Authority d/b/a Erlanger Medical Center and/or Erlanger Health System ("Erlanger")" (Court File No. 55-8).[7] Although the amended and second amended complaints were filed in the same state court case, the action was ultimately removed to this Court, Case No. 1:07-cv-258. Exhibit D is a news article from October 29, 2004, describing the nature of Stratienko's pleadings filed in state court (Court File No. 55-4).

Erlanger offers as exhibits several decisions from the Tennessee appellate courts addressing discovery requests made in the *Stratienko* case pertaining to Monroe's credentials (*see generally* Court File Nos. 55-9 to 55-12). Exhibit M, of particular note, which was a brief filed in response to a motion for attorney's fees before this Court, sets forth the timeline relating to Dr. Stratienko's

---

[7] According to a later court filing by Dr. Stratienko (i.e. an exhibit to his response brief regarding attorney's fees), the letter of intent indicated that Erlanger would provide financial incentives for referrals of patients from CHI to Erlanger (Court File No. 55-14).

suspicions about Monroe's lack of credentials and qualifications and the fact that Dr. Stratienko had even informed Erlanger of his concerns (Court File No. 55-13).

Erlanger has also provided the Court with various documents that were attached as exhibits to Stratienko's response brief to the motion for attorney's fees in the *Stratienko* case. In Exhibit N, Dr. Stratienko describes the reasons he brought suit against Erlanger and others (Court File No. 55-14). Among other things, he noted the Letter of Intent discussed earlier indicated Erlanger would provide financial incentives for referrals of patients from CHI to Erlanger. He also describes how he believes Mutter's appointment was improper given the alleged conflict of interest that CHI had with Erlanger. He further pointed out how he had called Monroe's credentials into question and how the discovery in the litigation supported his conclusions. Finally, he noted various problems with the cardiac call schedule.

The final document, Exhibit P, is a draft FCA complaint from the United States used for purposes of settlement. It was never actually filed in court by the United States. However, Dr. Stratienko offered it as an exhibit to the response brief regarding attorney's fees in the *Stratienko* litigation (Court File No. 55-16) and it was thoroughly discussed and analyzed in a *Chattanooga Times Free Press* article from July 17, 2006, entitled "Documents Outline Feds' Case Against Erlanger" (Court File No. 55-6). The draft complaint details how Erlanger set out as early as 1995 "to improve its lagging financial condition by encouraging greater physician 'loyalty' through . . . numerous, lucrative physician service agreements and leases with several large physician groups practicing in the area" (*id.* at 14-15). Specifically, the draft complaint alleges Erlanger entered into financial arrangements with various physician groups and physicians that would refer patients to Erlanger for hospital services. These groups included UT Physicians, Galen Medical Group,

19

Orthopaedic Associates, and University Surgical Associates. The dates of the allegations at issue ranged from 1995 to 2003. In some instances, such as with UT Physicians, the United States alleged payments were being made where no contract existed. As another example, with respect to Galen, the complaint alleged Erlanger had not complied with the law because Erlanger had entered into agreements with Galen "that allowed payments based on business generated, agreements that provided for compensation substantially in excess of fair market value, and payments made without any written agreement" (*id.* at 18). As a result of these and other actions, the United States alleged Erlanger, *inter alia*, provided illegal remuneration and inducements to physicians and physician groups, submitted false and fraudulent claims, and obtained fraudulent payments from the United States based upon referrals by numerous physicians in violation of the Stark Act, Anti-Kickback Statute, & FCA. These allegations supported causes of action for violations of 31 U.S.C. §§ 3729(a)(1) & (2)[8] of the FCA as well as various state law claims.

Although Relator contends these disclosures did not reveal the same kind of fraudulent activity against the government as alleged in her amended complaint because "[n]one of the exhibits relied upon by Erlanger make a direct allegation of fraud, and none of the [e]xhibits contain 'both the state of the facts as they are plus the misrepresented facts'" (Court File No. 56 at 26), the Court concludes the government was adequately put on notice of the likelihood of fraud from these disclosures. First, as noted above, to satisfy this requirement the disclosures do not have to make specific allegations of fraud or even use the word "fraud." Yet, the Court observes Exhibit P--the United States' draft FCA complaint from 2005, which was referenced by Dr. Stratienko as an exhibit

_____

[8] In 2009, several FCA provisions were amended and renumbered. These provisions are now numbered as 31 U.S.C. §§ 3729(a)(1)(A) and (B), which are the provisions at issue in the instant case.

20

in the well-publicized *Stratienko* case and was cited and discussed in a newspaper article--shows the government was well aware of the "kinds" of fraudulent activity engaged in by Erlanger even if the government's knowledge pertained to events that occurred at a different time or involving different physicians and physician groups. For instance, the United States' draft FCA complaint at a minimum reveals the government was aware of allegations that Erlanger, in an effort to increase physician "loyalty" and patient referrals, made payments to various physicians and physician groups in the absence of written contracts or with contracts that did not satisfy the requirements of the Stark Act or Anti-Kickback Statute between the years of 1995 and 2003. One of those agreements even involved Galen, a physician group mentioned in Relator's amended complaint. Though Relator's allegations pertain to improper financial arrangements involving Erlanger and groups such as UTCOM, IMEF, CHI, and Galen in 2004 and after, those allegations still follow the same general pattern in which Erlanger made payments for services in the absence of an executed written agreement and those physicians and physician groups made patient referrals to Erlanger.

Second, a number of the disclosures did not directly allege fraud but, nonetheless, still served to put the government on notice of potential issues that may still exist. For instance, one issue raised in Relator's amended complaint pertains to the financial arrangements reached between Erlanger and Mutter and how he was paid in excess of market value. Yet, as described in Exhibit A, as early as 2003, Dr. Stratienko was in the news for telling Erlanger he believed, *inter alia*, the agreement reached between Erlanger and Mutter making Mutter the cardiology director at a salary of $50,000 was unfair, especially when Stratienko was willing to perform the job for free. Another issue raised by Relator in her amended complaint pertained to the fact CHI was paid in excess of market value for services provided. Previous public disclosures regarding the United States' draft complaint,

however, reveal information had already been publicly disclosed regarding how Erlanger entered into agreements with various physician groups that were "substantially in excess of fair market value." And other sources, such as the amended complaint in the *Stratienko* case, reveal how Dr. Stratienko believed Erlanger had entered into agreements with CHI that resulted in unequal treatment toward other cardiology groups.

Next, the Court observes the public disclosures reveal issues pertaining to Dr. Monroe's lack of proper credentials. Relator alleges in the amended complaint that Monroe lacked proper credentialing and that, despite the lack of training, he was granted privileges by Erlanger to perform various medical procedures. Dr. Stratienko's litigation in state and federal court, however, similarly reveals Dr. Stratienko's concerns about Monroe's lack of training and qualifications. In fact, the documents even reveal Dr. Stratienko himself informed Erlanger of the problem.

Finally, the Court observes the government would have known Erlanger had a history of allegedly submitting false and fraudulent claims and receiving fraudulent reimbursements in light of the public disclosures. Most notably, the United States itself drafted an FCA complaint in 2005 against Erlanger raising very similar allegations. Moreover, the newspaper article covering the story discussed how Erlanger allegedly submitted false claims and received reimbursements from both the federal government and the State of Tennessee in violation of the FCA.

Viewing all of these sources in the aggregate, it is apparent the government had adequate notice of the likelihood of fraud in this case. *Dingle v. Bioport Corp.*, 388 F.3d 209, 214 (6th Cir. 2004) ("The fact that the information comes from different disclosures is irrelevant."). Most notably, the public disclosures reveal the same kinds of fraudulent activity engaged in by Erlanger that are alleged in Relator's amended complaint. While some of the documents demonstrate the government

22

was already on notice that Erlanger had engaged in similar fraudulent activity, other sources provide background information and/or supplement the prior allegations of fraud.

### iii. "Based Upon"

The next consideration is whether Relator's amended complaint is "based upon" the public disclosures of fraud. *See United States ex rel. Poteet v. Medtronic, Inc.*, 552 F.3d 503, 513-14 (6th Cir. 2009). "[A] complaint is 'based upon' a public disclosure when it is 'supported by' the previously disclosed information." *Id.* at 514 (citing *United States ex rel. McKenzie v. BellSouth Telecommunications, Inc.*, 123 F.3d 935, 940 (6th Cir. 1997)). In making this determination, the court should "look to whether substantial identity exists between the publicly disclosed allegations or transactions and the *qui tam* complaint." *Id.* (quoting *United States ex rel. Jones v. Horizon Healthcare Corp.*, 160 F.3d 326, 332 (6th Cir. 1998)). In *Poteet*, the Sixth Circuit even cites *United States ex rel. Boothe v. Sun Healthcare Group, Inc.*, 496 F.3d 1169, 1174 (10th Cir. 2007) for the proposition that "[n]ot a single circuit has held that a complete identity of allegations, even as to time, place, and manner is required to implicate the public disclosure bar; rather all have held, at a minimum, that dismissal is warranted where the plaintiff seeks to pursue a claim, the essence of which is 'derived from' a prior public disclosure." *Id.* at 514. Hence, "[a]ny 'action based *even partly* upon public disclosures' will be jurisdictionally barred." *Id.*

As an illustration, in *Poteet*, the Sixth Circuit concluded the information in the relator's complaint was "based upon" the information contained in a prior complaint. The court noted that the *qui tam* complaint contained one major allegation that had not been raised previously. *Id.* at 514. Further, the court observed that "the particular details concerning the kickbacks paid and the defendants involved are slightly different." Nonetheless, the court concluded "the illegal scheme

described in Poteet's complaint is essentially the same as the scheme alleged by Wiese in his complaint." *Id.*

Relator argues the amended complaint cannot be "based upon" the public disclosures because there is not a "substantial identity" between the disclosed allegations and transactions and those alleged in the amended complaint. Relator highlights some of the differences between the allegations in the amended complaint versus the public disclosures, most notably pointing out that (1) none of the exhibits mentions the submission of false Medicare claims; (2) none refers to the specific contracts and arrangements referenced in the *qui tam* complaint; (3) none of the exhibits refers to violations of the CIA; (4) none deals with FCA filings; (5) with the exception of one document, none makes mention of the IMEF; and (6) almost all of the conduct in the public disclosures pertain to events that preceded the events alleged in the amended complaint.

Admittedly, the allegations in the amended complaint are not identical to the arrangements and transactions described in the public disclosures. For instance, there are differences with regard to the specific physician groups, physicians, and agreements at issue as noted by Relator. As explained in *Poteet*, however, the fact that some allegations or parties may be different does not mean the complaint is not "based upon" the disclosures, especially where as here the fraudulent schemes and improper arrangements, the agreements in excess of market value, the allegations pertaining to Monroe's credentialing, and the submission of false claims substantially resemble the allegations and transactions discussed in the public disclosures.[9] In fact, as noted by Erlanger, some

---

[9]The Court does observe that the prior disclosures do not make any mention of violations of the CIA. With that said, it is not clear from Relator's amended complaint that she is alleging a violation of the FCA due to alleged violations of the CIA. Therefore, this is presently a moot issue. As the Court will explain later in this memorandum, however, Relator will be given an opportunity to make this cause of action more explicit if that is actually her intent.

of the language in Relator's amended complaint even mirrors the language in the United States' draft

FCA complaint.

Moreover, the fact that many of the arrangements and transactions alleged in the amended

complaint occurred subsequent to those mentioned in the public disclosures does not make the

public disclosure bar inapplicable. For instance, in *Boothe*, the Tenth Circuit determined the *qui tam*

complaint was "based upon" prior public disclosures. 496 F.3d 1169 (10th Cir. 2007). The relator

argued, among other things, that the "time, place, and manner" of the alleged fraud differed. She

pointed out that the disclosures from prior litigation revealed fraudulent conduct in 1998 or 1999

but her *qui tam* suit pertained to practices of the defendant that occurred between 2000 and 2002.

She also argued that, while the type of fraudulent conduct was identical, the conduct was engaged

in by different affiliates of the defendant. The court concluded, however, that her claims were clearly

"supported by" or "partly based upon" the disclosures in the previous *qui tam* cases, which was all

that was necessary to satisfy this element of the public disclosure bar. *See Fed. Recovery Servs., Inc.

v. United States*, 72 F.3d 447, 451 (5th Cir. 1995) (noting that although FRS "presses that its

investigation unearthed additional instances of fraudulent conduct by Crescent City that were not

a part of the earlier, state court litigation," the court could still conclude FRS's *qui tam* action was

"based upon" the public disclosures from the state court action); *see also Glaser v. Wound Care

Consultants, Inc.*, 570 F.3d 907, 920 (7th Cir. 2009) ("Glaser argues that her complaint is not based

on the CMS investigation because her complaint contains particular allegations of fraud that are not

mentioned in CMS's January or March 2005 communications with Wound Care nor discovered

during its investigation into Wound Care's billing practices. It is true that Glaser's complaint adds

a few allegations not covered by CMS's investigation. But this is not enough to take this case

25

outside the jurisdictional bar, properly understood; 'based upon' does not mean 'solely based upon.'").

Similarly, here, the Court acknowledges there may not be a complete identity of "time, place, and manner" between the facts alleged in Relator's amended complaint and the information revealed in the public disclosures. Yet there is enough similarity for the Court to conclude the allegations in the amended complaint are "based upon" or are substantially similar to the public disclosures. The allegations in the amended complaint can be generally categorized as allegations that pertain to unlawful remuneration and improper arrangements in the absence of written agreements between Erlanger and various physicians and physician groups; the payment of CHI and Mutter in excess of fair market value; the lack of credentialing and qualifications of Dr. Monroe; and more broadly, the submission of false claims to and the improper receipt of reimbursements from the federal government and the State of Tennessee. As this Court has already explained above, while some of the parties to the arrangements may be different and the exact arrangements and transactions at issue may not be the same, the allegations appear to derive their very essence from matters that have already been raised publicly in the United States' draft FCA complaint, which was covered by the media and referenced in Relator's husband's litigation, as well as in the numerous articles in *The Chattanoogan* and the *Chattanooga Times Free Press*. Thus, because the allegations in the amended complaint are at least based in part on the public disclosures, the Court concludes the "based upon" requirement has been satisfied.

### iv. Original Source

The final step when neither of the other elements has been met is to determine whether Relator is the original source of the information at issue. If so, the public disclosure bar will not

26

apply. Prior to the amendments brought by the PPACA, the statute defined "original source" as "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information." 31 U.S.C. § 3730(e)(4)(B). Post-PPACA, "original source" has been defined as follows: "an individual who either (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section." 31 U.S.C. § 3730(e)(4)(B). As noted by Erlanger, however, under either definition, Relator has failed to establish she was an "original source." First, Relator does not allege she voluntarily disclosed the information at issue to the government prior to the public disclosures. Moreover, Relator does not allege she had "direct and independent knowledge" of the information at issue nor does she even allege she had knowledge "independent of and [that] materially adds" to the public disclosures. Most if not all of Relator's information appears to come from her husband who was extensively covered in the media and who was a party to the litigation discussed earlier. In fact, Relator essentially concedes by her failure to respond to this issue in her response brief that she is not an original source.

Accordingly, taking all of the above into account, the Court concludes the public disclosure bar applies. Relator's FCA claims--specifically the claims that Erlanger presented false claims in violation of 31 U.S.C. § 3729(a)(1)(A) and that Erlanger made or used a false record or statement to cause a claim to be paid in violation of 31 U.S.C. § 3729(a)(1)(B)--will be dismissed. For similar

reasons, Relator's state law FCA claims will also be dismissed. Because Relator's FCA claims are being dismissed pursuant to the public disclosure bar, the Court will not consider the additional grounds for dismissal of the FCA claims raised in Erlanger's motion.

### B.      Violation of CIA (Count I)

Relator's remaining cause of action alleges violations of the Corporate Integrity Agreement or "CIA" entered into by Erlanger and the OIG as part of the $40 million settlement agreement. Erlanger argues this count should be dismissed because it does not state a claim under the FCA. Erlanger notes that this count, unlike the other two, fails to explicitly reference the FCA. Therefore, it appears to be, in essence, a breach of contract claim. Erlanger claims Relator cannot bring a breach of contract claim, however, because she was not one of the parties to the CIA nor does she have standing to assert such a claim. Erlanger further points out that Relator fails to allege the violation resulted in reverse FCA liability or that it caused the government to pay money it would not have otherwise paid.

Relator, in response, claims she is asserting an FCA claim based on Erlanger's breach of the CIA. Additionally, the United States, in its statement of interest, contends that to the extent this claim is being brought as part of a *qui tam* complaint, Relator can bring suit on behalf of the United States for a material breach of the CIA regardless of whether she was a party to the agreement. *See* 31 U.S.C. § 3730(b)(1) ("A person may bring a civil action for a violation of section 3729 for the person and for the United States Government. The action shall be brought in the name of the United States . . . .").

The Court observes that the plain language of Count I, the "Violations of the Corporate Integrity Agreement" claim, makes no mention of the FCA. Nonetheless in light of Relator's

averments and those of the United States, as well as the broader context of the amended complaint, the Court concludes the count could be construed as such and finds Relator should be afforded an opportunity to amend the complaint to make this allegation clear. Accordingly, the Court will deny Erlanger's motion to dismiss at this stage with respect to Count I to give Relator an opportunity to more clearly articulate the legal basis for this claim. Relator will have fourteen days from the entry of the accompanying Order to submit an amended complaint with respect to Count I. The Court will entertain any new or reasserted grounds for dismissal from Erlanger with respect to this count, if necessary, after Relator has made changes to the amended complaint.

## IV.     CONCLUSION

For the foregoing reasons, the Court will **GRANT IN PART** and **DENY IN PART** Erlanger's motion to dismiss (Court File No. 53).

An Order shall enter.

*/s/*_____
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**